**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ) | CRIMINAL NO. *10-10280-DPW* |
| UNITED STATES OF AMERICA ) | |
| ) | VIOLATIONS: |
| ) | |
| v.                         ) | 18 U.S.C. §1343 (Wire Fraud) |
| ) | 18 U.S.C. §1344 (Bank Fraud) |
| ) | 18 U.S.C. §1957 (Unlawful Monetary |
| MICHAEL R. ANDERSON ) | Transactions) |
| ) | 18 U.S.C. §§981, 982 (Forfeiture) |
| Defendant.       ) | 28 U.S.C. §2461 (Forfeiture) |
| ) | |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

## GENERAL ALLEGATIONS

At times relevant to this Information:

### THE DEFENDANT

1.     Defendant Michael R. Anderson ("ANDERSON") was an individual who resided in Massachusetts.

2.     ANDERSON was an attorney licensed to practice law in the Commonwealth of Massachusetts. ANDERSON maintained a law office in Stoneham, Massachusetts and controlled a bank account in the name of Michael R. Anderson, d/b/a Law Offices of Michael R. Anderson.

### THE DEVELOPER

3.     At all times material to this Information, Michael David Scott (the "Developer") was the owner and operator of a real estate development company located in Boston, Massachusetts. The Developer was also the owner and operator of an apartment building management company located in Boston, Massachusetts.

## THE STRAW BUYERS

4.      Individuals referred to herein as "T.R.", "L.F.", "A.D.", "P.J.", "D.T.", "A.F.", "J.G.", "K.B-S.", "M.S.#1", "A.S.#1", "A.S.#2", "G.H.", "R.H.", "C.B.", "C.G.", "S.V.", "M.T.", "T.M.", "M.P.", "S.S.", "M.S. #2", "A.P.", "D.S.", "J.A." were persons who were recruited to serve as "straw buyers."

5.      As used in this Information, the term "straw buyer" refers to an individual in whose name title to real property was taken and in whose name financing from the mortgage lenders was fraudulently obtained. In most instances, the straw buyers made no down payment, paid no closing costs, had no intention to reside in the real property, and had no personal ability or intention to make the mortgage loan payments.

## THE MORTGAGE LENDERS

6.      Gateway Funding Diversified Mortgage Services, LP ("Gateway Funding") was a real estate mortgage company with a principal place of business at 300 Welsh Road, Horsham, Pennsylvania.

7.      New York Mortgage Company, LLC ("NYC Mortgage") was a real estate mortgage company with a principal place of business at 1301 Avenue of the Americas, New York, New York.

8.      Homecomings Financial, LLC ("Homecomings") was a real estate mortgage company with a principal place of business at 9 Sylvan Way, Parsippany, New Jersey.

9.      Citimortgage, Inc. ("Citimortgage") was a real estate mortgage company with a principal place of business at 1000 Technology Drive, O'Fallon, Missouri.

10.     Summit Mortgage, LLC ("Summit Mortgage") was a real estate mortgage company with a principal place of business at 301 Edgewater Place, Wakefield, Massachusetts.

2

11.     First Horizon Home Loans ("First Horizon") was a real estate mortgage company with a principal place of business at 4000 Horizon Way, Irving, Texas.

12.     National City Mortgage Corporation ("National City") was a real estate mortgage company with a principal place of business at 3232 Newmark Drive, Miamisburg, Ohio.

13.     Salem Five Cents Savings Bank ("Salem Five") was a federally insured financial institution with a principal place of business at 210 Essex Street, Salem, Massachusetts.

14.     Gateway Funding, NYC Mortgage, Homecomings, Citimortgage, Summit Mortgage, First Horizon, National City, and Salem Five are collectively referred to herein as "the mortgage lenders."

### THE SCHEME TO DEFRAUD

15.     Beginning in or about September 2006, and continuing through in or about April 2008, the Developer, together with ANDERSON and other associates of the Developer known and unknown to the United States Attorney, defrauded the mortgage lenders and obtained money, funds, credits, assets, and other property owned by and under the custody and control of the mortgage lenders by means of material false and fraudulent pretenses, representations and promises, in connection with the financing of residential real estate purchases in Boston, Massachusetts, by "straw buyers" recruited by the Developer, ANDERSON, and other associates of the Developer.

16.     The fraud was executed in the following manner:

        a.      The Developer and others identified multiple-family buildings to purchase for conversion to condominiums and for resale of the condominiums as individual units. The Developer, ANDERSON, and others also recruited

straw buyers to purchase the condominiums as so-called investment properties.

b.      The Developer and others:

i.      paid funds to straw buyers for participating in the purchase of condominiums;

ii.     promised straw buyers that loans to finance the purchase of condominiums would be obtained from the mortgage lenders in the names of straw buyers;

iii.    promised straw buyers that the straw buyers did not have to make down payments or pay any funds in connection with the closings associated with the mortgage loans;

iv.     promised straw buyers that the properties would be maintained on behalf of the straw buyers;

v.      promised straw buyers that tenants would be obtained on behalf of the straw buyers to rent the condominiums and mortgage payments would be paid from income received from these rents;

vi.     promised straw buyers that in the event rental income was not sufficient to cover mortgage payments the payments would be made on behalf of the straw buyers for a period of time, in some instances up to one year; and

vii.    promised straw buyers that the straw buyers would receive, or share in, the proceeds when the condominiums were resold.

4

c.   Once straw buyers agreed to participate, the Developer and others engaged mortgage loan brokers and mortgage originators to prepare fraudulent mortgage loan applications in the names of the straw buyers and to secure loans from mortgage lenders.

d.   The Developer and others arranged to prepare various mortgage loan applications and supporting documents that: (i) reflected falsely inflated purchase prices for the condominiums; (ii) falsely represented that straw buyers would occupy the condominiums as the straw buyers' "primary" or "secondary" residences; and (iii) falsely represented that straw buyers owned substantial assets held as balances in bank accounts.

e.   The Developer and others arranged with ANDERSON to conduct closings for the mortgage loans in the names of straw buyers.  ANDERSON, the Developer, and others also arranged to prepare various loan closing documents, including HUD-1 settlement statements, which falsely represented that straw buyers had made down payments and that straw buyers would pay, and had paid, other funds at or in connection with the closings associated with the mortgage loans.

f.   The Developer, ANDERSON, and others caused the mortgage lenders to fund mortgage loans through wire transfers to ANDERSON's bank account.

g.   ANDERSON and others caused mortgage loan proceeds to be disbursed from ANDERSON's account to the Developer, in most instances to the

5

Developer's Bank of America account No. xxxxxxxx5111. In turn, the Developer further disbursed a portion of the loan proceeds to others.

h.    After closings were conducted by ANDERSON and mortgage loan proceeds were disbursed, the Developer tendered to ANDERSON funds in amounts falsely represented on HUD-1 settlement statements as having been paid by straw buyers.

17.    Most of the mortgages for the properties involved in the scheme went into default and some went into foreclosure. The scheme caused substantial losses to the mortgage lenders.

## EXECUTION OF THE FRAUD

### 78-80 GRANGER STREET
### Dorchester, Massachusetts

18.    On or about December 27, 2006, the Developer bought a multi-family dwelling at 78-80 Granger Street in Dorchester, Massachusetts, for $560,000.

19.    In or about December 2006, the Developer and others recruited T.R., L.F., and A.D. as straw buyers for condominium Units 1, 2, and 3, respectively. The Developer and others assured T.R., L.F., and A.D. that they would not have to make a significant down payment or any down payment at all, and would not have to pay any funds at or in connection with the closing. The Developer and others further assured T.R., L.F., and A.D. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. The Developer and others further assured T.R., L.F., and A.D. that they would receive, or share in, any profits from the resale of the condominiums.

6

20.    In or about December 2006 and January 2007, T.R., L.F., and A.D. each agreed to participate in the purchases of Units 1, 2, and 3, respectively.

21.    On or about December 29, 2006, T.R. purchased Unit 1 through a mortgage loan from Gateway Funding in the amount of $332,500. False representations in connection with the loan included representations that the purchase price was $350,000, that the unit was T.R.'s "secondary" residence, that T.R. owned a bank balance of $42,518.44, and that T.R. paid $17,939.09 at the closing.

22.    On or about December 29, 2006, L.F. purchased Unit 2 through first and second mortgage loans from NYC Mortgage in the aggregate amount of $315,000. False representations in connection with the loans included representations that the purchase price was $350,000, that the unit was L.F.'s "primary" residence, and that L.F. paid $47,679.66 at the closing.

23.    On or about January 4, 2007, A.D. purchased Unit 3 through a mortgage loan from Gateway Funding in the amount of $332,500. False representations in connection with the loan included that the purchase price was $350,000, that the unit was A.D.'s "secondary" residence, that A.D. owned a bank balance of $37,112.54, and that A.D. paid $21,762.74 at the closing.

24.    From on or about December 29, 2006 to on or about January 4, 2007, Gateway Funding and NYC Mortgage wired funds to ANDERSON's account in connection with the purchases of 78-80 Granger Street, Units 1, 2, and 3.

25.    From on or about January 2, 2007, to on or about January 8, 2007, ANDERSON disbursed loan proceeds to the Developer and others knowing that the loans were obtained through fraud.

7

26.     From on or about January 3, 2007, to on or about January 4, 2007, the Developer tendered to ANDERSON funds that ANDERSON knew were falsely represented on the HUD-1 settlement statements as having been paid by the straw buyers.

### 22 ELMORE STREET
### Roxbury, Massachusetts

27.     On or about June 30, 2006, a multi-family dwelling at 22 Elmore Street, Roxbury, Massachusetts was purchased in the name of E.J-S., wife of the Developer, for $326,000.

28.     In or about April 2007, the Developer and others recruited P.J. as a straw buyer for condominium Unit 1 and recruited D.T. as a straw buyer for condominium Units 2 and 3. The Developer and others assured P.J. and D.T. that they would not have to make a significant down payment or any down payment at all, and would not have to pay any funds at or in connection with the closing. The Developer and others further assured P.J. and D.T. that they would have no responsibility for making mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding the subsequent buyers for resale of the condominiums. The Developer and others further assured P.J. and D.T. that they would receive, or share in, any profits from the resale of the condominiums.

29.     In or about April 2007, P.J. and D.T. each agreed to participate in the purchases of Units 1, 2, and 3.

30.     On or about April 16, 2007, P.J. purchased Unit 1 through first and second mortgage loans from Gateway Funding in the aggregate amount of $333,000. False representations in connection with the loans included representations that the purchase price was $370,000, that the unit was P.J.'s "secondary" residence, that P.J. made a down payment of $37,900, and that P.J. paid $3,001.21 at the closing.

31.     On or about April 16, 2007, D.T. purchased Unit 2 through first and second mortgage loans from Gateway Funding in the aggregate amount of $365,000. False representations in connection with the loans included representations that the purchase price was $365,000, that the unit was D.T.'s "primary" residence, that D.T. owned a bank balance of $45,218.85, and that D.T. paid $5,146,19 at the closing.

32.     On or about April 16, 2007, D.T. purchased Unit 3 through first and second mortgage loans from Gateway Funding in the aggregate amount of $328,500. False representations in connection with the loans included representations that the purchase price was $365,000, that D.T. owned a bank balance of $45,218.85, and that D.T. paid $42,654.95 at the closing.

33.     From on or about April 16, 2007, to on or about April 17, 2007, Gateway Funding wired funds to ANDERSON's account in connection with the purchases of 22 Elmore Street, Units 1, 2, and 3.

34.     On or about April 16, 2007, ANDERSON disbursed loan proceeds to the Developer and others knowing that the loans were obtained through fraud.

35.     On or about April 17, 2007, the Developer tendered to ANDERSON funds that ANDERSON knew were falsely represented on the HUD-1 settlement statements as having been paid by the straw buyers.

### 365 CENTRE STREET
### Dorchester, Massachusetts

36.     On or about August 10, 2007, the Developer purchased a multi-family dwelling at 365 Centre Street, Dorchester, Massachusetts for $460,000.

37.    In or about August 2007, the Developer and others recruited A.F., J.G., and K.B-S. as straw buyers for condominium Units 1, 2, and 3, respectively. The Developer and others assured A.F., J.G., and K.B-S. that they would not have to make a significant down payment or any down payment at all, and would not have to pay any funds at or in connection with the closing. The Developer and others further assured A.F., J.G., and K.B-S. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. The Developer and others further assured A.F., J.G., and K.B-S. that they would receive, or share in, any profits from the resale of the condominiums.

38.    In or about August 2007, A.F., J.G., and K.B-S. each agreed to participate in the purchases of Units 1, 2, and 3, respectively.

39.    On or about August 10, 2007, A.F. purchased Unit 1 through a mortgage loan from Gateway Funding in the amount of $260,100. False representations in connection with the loan included representations that the purchase price was $289,000, that the unit was A.F.'s "secondary" residence, that A.F. made a down payment of $29,400, and that A.F. paid $28,746.67 at the closing.

40.    On or about August 10, 2007,  J.G. purchased Unit 2 through a mortgage loan from Homecomings in the amount of $239,200. False representations in connection with the loan included representations that the purchase price was $299,000, that the unit was J.G.'s "primary" residence, that J.G. made a down payment of $29,400, and that J.G. paid $43,620.68 at the closing.

10

41.     On or about August 10, 2007, K.B-S. purchased Unit 3 through a mortgage loan
from Gateway Funding in the amount of $259,200. False representations in connection with the loan
included representations that the purchase price was $299,000, that K.B-S. made a down payment
of $28,800, and that K.B-S. paid $45,232.01 at the closing.

42.     On or about August 10, 2007, Gateway Funding and Homecomings wired funds to
ANDERSON's account in connection with the purchases of 365 Centre Street, Units 1, 2 and 3.

43.     From on or about August 10, 2007, to on or about August 13, 2007, ANDERSON
disbursed loan proceeds to the Developer and others knowing that the loans were obtained through
fraud.

44.     From on or about August 13, 2007, to on or about August 17, 2007, the Developer
tendered to ANDERSON funds that ANDERSON knew were falsely represented on the HUD-1
settlement statements as having been paid by the straw buyers.

## 81 SPENCER STREET
### Dorchester, Massachusetts

45.     On or about June 8, 2007, the Developer purchased a multi-family dwelling at 81
Spencer Street, Dorchester, Massachusetts for $250,000.

46.     In or about August 2007, the Developer and others recruited M.S.#1, A.F., and
A.S.#1 as straw buyers for condominium Units 1, 2, and 3, respectively. The Developer and others
assured M.S.#1, A.F., and A.S.#1 that they would not have to make a significant down payment or
any down payment at all, and would not have to pay any funds at or in connection with the closing.
The Developer and others further assured M.S.#1, A.F., and A.S.#1 that they would have no
responsibility for making the mortgage payments for a period of time, making repairs, finding
tenants to rent the condominiums, collecting rent, applying rental income to property costs, or

11

finding subsequent buyers for resale of the condominiums. The Developer and others further assured M.S.#1, A.F., and A.S.#1 that they would receive, or share in, any profits from the resale of the condominiums.

47.     In or about August 2007, M.S.#1, A.F., and A.S.#1 each agreed to participate in the purchases of Units 1, 2, and 3, respectively.

48.     On or about August 22, 2007, M.S.#1 purchased Unit 1 through a mortgage loan from Citimortgage in the amount of $169,150. False representations in connection with the loan included representations that the purchase price was $199,000, that M.S.#1. made a down payment of $19,900, that M.S.#1 owned a bank account balance of $113,400, that M.S.#1 owned real estate with a value of $588,700, and that M.S.#1 paid $15,002.37 at the closing.

49.     On or about August 24, 2007, A.F. purchased Unit 2 through a mortgage loan from Summit Mortgage in the amount of $191,250. False representations in connection with the loan included representations that the purchase price was $225,000, that A.F. made a down payment of $22,500, and that A.F. paid $18,310.52 at the closing.

50.     On or about August 21, 2007, A.S.#1 purchased Unit 3 through a mortgage loan from Gateway Funding in the amount of $202,500. False representations in connection with the loan included representations that the purchase price was $225,000, that the unit was A.S.#1's "secondary" residence that A.S.#1. made a down payment of $22,500, and that A.S.#1 paid $11,991.52 at the closing.

51.     From on or about August 22, 2007, to on or about August 27, 2007, Citimortgage, Summit Mortgage and Gateway Funding wired funds to ANDERSON's account in connection with the purchases of 81 Spencer Street, Units 1, 2 and 3.

12

52.     From on or about August 22, 2007 to on or about August 27, 2007, ANDERSON disbursed loan proceeds to the Developer and others knowing that the loans were obtained through fraud.

53.     From on or about August 24, 2007 to on or about August 28, 2007, the Developer tendered to ANDERSON funds that ANDERSON knew were falsely represented on the HUD-1 settlement statements as having been paid by the straw buyers.

## 10 NAVILLUS TERRACE
### Dorchester, Massachusetts

54.     On or about September 27, 2007, the Developer purchased a multi-family dwelling at 10 Navillus Terrace, Dorchester, Massachusetts for $469,200.

55.     In or about September 2007, the Developer and others recruited A.S.#2, G.H., and R.H. as straw buyers for condominium Units 1, 2, and 3, respectively. The Developer and others assured A.S.#2, G.H., and R.H. that they would not have to make a significant down payment or any down payment at all, and would not have to pay any funds at or in connection with the closing. The Developer and others further assured A.S.#2, G.H., and R.H. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. The Developer and others further assured A.S.#2, G.H., and R.H. that they would receive, or share in, any profits from the resale of the condominiums.

56.     In or about September 2007, A.S.#2, G.H., and R.H. each agreed to participate in the purchases of Units 1, 2, and 3, respectively.

57.     On or about September 28, 2007, A.S.#2 purchased Unit 1 through a mortgage loan from First Horizon in the amount of $258,750. False representations in connection with the loan

13

included representations that the purchase price was $345,000, that A.S.#2 made a down payment of $86,250, that A.S.#2 owned a bank account balance of $120,000, and that A.S.#2 paid $5,090.62 at the closing.

58.     On or about September 28, 2007, G.H. purchased Unit 2 through a mortgage loan from Salem Five in the amount of $258,750. False representations in connection with the loan included representations that the purchase price was $345,000, that G.H. made a down payment of $86,250, and that G.H. paid $5,574.98 at the closing.

59.     On or about September 27, 2007, R.H. purchased Unit 3  through a mortgage loan from Salem Five in the amount of $258,750. False representations in connection with the loan included representations that the purchase price was $345,000, that the unit was R.H.'s "secondary" residence, that R.H. made a down payment of $86,250, and that R.H. paid $5,801.26 at the closing.

60.     On or about September 28, 2007, First Horizon wired funds to an account in Providence, Rhode Island, which funds were further wired to ANDERSON's account in connection with the purchase of 10 Navillus Terrace, Unit 1, and Salem Five wired funds to ANDERSON's account in connection with the purchases of 10 Navillus Terrace, Units 2 and 3.

61.     From on or about September 27, 2007, to on or September 28, 2007, ANDERSON disbursed loan proceeds to the Developer and others knowing that the loans were obtained through fraud.

62.     On or about September 27, 2007, ANDERSON and the Developer tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statements as having been paid by the straw buyers for Unit 1. On or about October 1, 2007, the Developer and others

14

tendered to ANDERSON funds that ANDERSON knew were falsely represented on the HUD-1 settlement statements as having been paid by the straw buyers for Units 2 and 3.

## 5 PARKMAN STREET
### Dorchester, Massachusetts

63.     On or about September 21, 2007, the Developer purchased a multi-family dwelling at 5 Parkman Street, Dorchester, Massachusetts for $790,000.

64.     In or about September 2007, the Developer and others recruited C.B., C.G., S.V., M.T., T.M., and M.P. as straw buyers for condominium Units 1L, 1R, 2L, 2R, 3L, and 3R, respectively. The Developer and others assured C.B., C.G., S.V., M.T., T.M., and M.P. that they would not have to make a significant down payment or any down payment at all, and would not have to pay any funds at or in connection with the closing. The Developer and others further assured C.B., C.G., S.V., M.T., T.M., and M.P. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. The Developer and others further assured C.B., C.G., S.V., M.T., T.M., and M.P. that they would receive, or share in, any profits from the resale of the condominiums.

65.     In or about September 2007, C.B., C.G., S.V., M.T., T.M., and M.P. each agreed to participate in the purchases of Units 1L, 1R, 2L, 2R, 3L, and 3R, respectively.

66.     On or about September 21, 2007, C.B. purchased Unit 1L through a mortgage loan from First Horizon in the amount of $192,750. False representations in connection with the loan included representations that the purchase price was $257,000, that C.B. made a down payment of $25,700, that C.B. owned a bank account balance of $114,000, and that C.B. paid $38,567.02 at the closing.

15

67.    On or about September 21, 2007, C.G. purchased Unit 1R through a mortgage loan from First Horizon in the amount of $195,500. False representations in connection with the loan included representations that the purchase price was $262,000, that C.G. made a down payment of $26,200, that C.G. owned a bank account balance of $74,000, and that C.G. paid $40,300 at the closing.

68.    On or about September 21, 2007, S.V. purchased Unit 2L through a mortgage loan from First Horizon in the amount of $220,915. False representations in connection with the loan included representations that the purchase price was $259,900, that the unit was S.V.'s "secondary" residence, that S.V. made a down payment of $25,990, that S.V. owned a bank account balance of $50,000, and that S.V. paid $12,995 at the closing.

69.    On or about September 21, 2007, M.T. purchased Unit 2R through a mortgage loan from Salem Five in the amount of $224,900. False representations in connection with the loan included representations that the purchase price was $299,900, that the unit was M.T.'s "primary" residence, that M.T. made a down payment of $26,100, and that M.T. paid $50,980.04 at the closing.

70.    On or about September 21, 2007, T.M. purchased Unit 3L through a mortgage loan from Salem Five in the amount of $224,925. False representations in connection with the loan included representations that the purchase price was $299,900, that T.M. made a down payment of $26,090, and that T.M. paid $51,502.99 at the closing.

71.    On or about September 21, 2007, M.P. purchased Unit 3R through a mortgage loan from First Horizon in the amount of $234,900. False representations in connection with the loan included representations that the purchase price was $261,000, that the unit was M.P.'s "secondary"

residence, that M.P. made a down payment of $26,100, that M.P. owned a bank account balance of $160,000, and that M.P. paid $106.69 at the closing.

72.    On or about September 21, 2007, First Horizon and Salem Five wired funds to ANDERSON's account in connection with the purchases of 5 Parkman Street, Units 1L, 1R, 2L, 2R, 3L, and 3R.

73.    From on or about September 21, 2007, to on or about September 24, 2007, ANDERSON disbursed loan proceeds to the Developer and others knowing that the loans were obtained through fraud.

74.    On or about September 25, 2007, the Developer tendered to ANDERSON funds that ANDERSON knew were falsely represented on the HUD-1 settlement statements as having been paid by the straw buyers.

## 7 PARKMAN STREET
### Dorchester, Massachusetts

75.    On or about October 12, 2007, the Developer purchased a multi-family dwelling at 7 Parkman Street, Dorchester, Massachusetts for $690,000.

76.    From in or about October 2007, to in or about April 2008, the Developer and associates of the Developer recruited S.S., A.S.#2, M.S.#2, A.P., D.S., and J.A. as straw buyers for condominium Units 1L, 1R, 2L, 2R, 3L, and 3R, respectively. The Developer and others assured S.S., A.S.#2, M.S.#2, A.P., D.S., and J.A. that they would not have to make a significant down payment or any down payment at all, and would not have to pay any funds at or in connection with the closing. The Developer and others further assured S.S., A.S.#2, M.S.#2, A.P., D.S., and J.A. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property

17

costs, or finding subsequent buyers for resale of the condominiums. The Developer and others further assured S.S., A.S.#2, M.S.#2, A.P., D.S., and J.A. that they would receive, or share in, any profits from the resale of the condominiums.

77.     From in or about October 2007, to in or about April 2008, S.S., A.S.#2, M.S.#2, A.P., D.S., and J.A. each agreed to participate in the purchases of Units 1L, 1R, 2L, 2R, 3L, and 3R, respectively.

78.     On or about April 18, 2008, S.S. purchased Unit 1L through a mortgage loan from National City in the amount of $246,600. False representations in connection with the loan included representations that the purchase price was $274,000, that the unit was S.S.'s "primary" residence, that S.S. made a down payment of $29,000, and that S.S. owned a bank account balance of $12,401.50.

79.     On or about October 12, 2007, A.S.#2 purchased Unit 1R through a mortgage loan from Salem Five in the amount of $217,200. False representations in connection with the loan included representations that the purchase price was $271,500, that A.S.#2 made a down payment of $2,500, and that A.S.#2 paid $59,958.34 at the closing.

80.     On or about October 12, 2007, M.S.#2 purchased Unit 2L through a mortgage loan from Salem Five in the amount of $201,375. False representations in connection with the loan included representations that the purchase price was $268,500, that M.S.#2 made a down payment of $53,700, and that M.S.#2 paid $20,472.91 at the closing.

18

81.     On or about October 12, 2007, A.P. purchased Unit 2R through a mortgage loan from Salem Five in the amount of $205,125. False representations in connection with the loan included representations that the purchase price was $273,500, that the unit was A.P.'s "secondary" residence, that A.P. made a down payment of $68,375, and that A.P. paid $6,782.94 at the closing.

82.     On or about October 12, 2007, D.S. purchased Unit 3L through a mortgage loan from Salem Five in the amount of $205,125. False representations in connection with the loan included representations that the purchase price was $273,500, that the unit was D.S.'s "secondary" residence, that D.S. made a down payment of $5,000, and that D.S. paid $75,095.01 at the closing.

83.     On or about October 12, 2007, J.A. purchased Unit 3R through a mortgage loan from Salem Five in the amount of $194,925. False representations in connection with the loan included representations that the purchase price was $259,900, that the unit was J.A.'s "secondary" residence, that J.A. made a down payment of $25,990, and that J.A. paid $41,322.10 at the closing.

84.     On or about October 12, 2007, Salem Five wired funds to ANDERSON's account in connection with the purchases of 7 Parkman Street, Units 1R, 2L, 2R, 3L, and 3R. On or about April 18, 2008, National City wired funds to ANDERSON's account in connection with the purchase of 7 Parkman Street, Unit 1L.

85.     On or about October 12, 2007 and on or about April 18, 2008, ANDERSON disbursed loan proceeds to the Developer and others knowing that the loans were obtained through fraud.

86.     On or about October 15, 2007, the Developer tendered to ANDERSON funds that ANDERSON knew were falsely represented on the HUD-1 settlement statements as having been paid by straw buyers.

19

## COUNTS ONE through SIXTEEN
### (Wire Fraud – 18 U.S.C. §1343)

87.     The United States Attorney re-alleges and incorporates by reference paragraphs 1

through 86 of this Information and further charges that:

88.     On or about the following dates, in the District of Massachusetts and elsewhere,

### MICHAEL R. ANDERSON,

defendant herein, together with others known and unknown to the United States Attorney, having

devised and intending to devise a scheme and artifice to defraud, and for obtaining money and

property by means of material false and fraudulent pretenses, representations, and promises, did

cause writings, signs, signals, pictures and sounds to be transmitted by means of wire

communication in interstate commerce for the purpose of executing such scheme and artifice, to wit,

wire transfers of fraudulently obtained mortgage loan proceeds, as follows:

| Count | Date | Property | Wire Transfer | Amount |
|-------|------|----------|---------------|--------|
| 1 | 12/29/2006 | 78-80 Granger Street, Unit 1, Dorchester, MA | From an account at UBS AG in New York, New York, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $324,151.18 |
| 2 | 04/17/2007 | 22 Elmore Street, Unit 1, Roxbury, MA | From an account at Deutsche Bank Trust Co., Americas in New York, New York, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $288,767.14 |
| 3 | 04/17/2007 | 22 Elmore Street, Unit 1, Roxbury, MA | From an account at Deutsche Bank Trust Co., Americas in New York, New York, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $35,109.86 |
| 4 | 04/17/2007 | 22 Elmore Street, Unit 2, Roxbury, MA | From an account at UBS AG in New York, New York, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $280,945.22 |

| Count | Date | Property | Wire Transfer | Amount |
|-------|------|----------|---------------|--------|
| 5 | 04/17/2007 | 22 Elmore Street, Unit 2, Roxbury, MA | From an account at Deutsche Bank Trust Co., Americas in New York, New York, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $72,326.25 |
| 6 | 04/17/2007 | 22 Elmore Street, Unit 3, Roxbury, MA | From an account at Deutsche Bank Trust Co., Americas in New York, New York, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $283,785.22 |
| 7 | 04/17/2007 | 22 Elmore Street, Unit 3, Roxbury, MA | From an account at Deutsche Bank Trust Co., Americas in New York, New York, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $35,544.99 |
| 8 | 08/10/2007 | 365 Centre Street, Unit 2, Dorchester, MA | From an account at JP Morgan Chase Bank, N.A. in New York, New York to the ANDERSON aceount, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $235,320.55 |
| 9 | 08/23/2007 | 81 Spencer Street, Unit 1, Dorchester, MA | From an account at Citibank, N.A. in New York, New York, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $162,320.66 |
| 10 | 08/27/2007 | 81 Spencer Street, Unit 2, Dorchester, MA | From an account at U.S. Bank, N.A. in St. Paul, Minnesota, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $181,846.46 |
| 11 | 08/22/2007 | 81 Spencer Street, Unit 3, Dorchester, MA | From an account at U.S. Bank, N.A. in St. Paul, Minnesota, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $183,667.48 |
| 12 | 09/21/2007 | 5 Parkman Street, Unit 1L, Dorchester, MA | From an account at First Tennessee Bank, N.A. in Memphis, Tennessee, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $191,200.51 |
| 13 | 09/21/2007 | 5 Parkman Street, Unit 1R, Dorchester, MA | From an account at First Tennessee Bank, N.A. in Memphis, Tennessee, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | $193,939.76 |

| Count | Date | Property | Wire Transfer | Amount |
|-------|------|----------|---------------|--------|
| 14 | 09/21/2007 | 5 Parkman Street, Unit 2L, Dorchester, MA | From an account at First Tennessee Bank, N.A. in Memphis, Tennessee, to the ANDERSON account, No. xxxxxx0057, at Central Coopcrative Bank in Somerville, Massachusetts. | \$214,533.42 |
| 15 | 09/21/2007 | 5 Parkman Street, Unit 3R, Dorchester, MA | From an account at First Tennessee Bank, N.A. in Memphis, Tennessee, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusctts. | \$227,501.84 |
| 16 | 04/18/2008 | 7 Parkman Street, Unit 1L, Dorchester, MA | From an account at National City Bank in Indianapolis, Indiana, to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | \$242,489.12 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS SEVENTEEN through TWENTY-FIVE
### (Bank Fraud – 18 U.S.C. §1344)

89.     The United States Attorney re-alleges and incorporates by reference paragraphs 1

through 86 of this Information and further charges that:

90.     On or about the following dates, in the District of Massachusetts and elsewhere,

### MICHAEL R. ANDERSON,

defendant herein, together with others known and unknown to the United States Attorney,

knowingly and wilfully executed and attempted to execute a scheme and artifice to defraud Salem

Five Cents Savings Bank, a federally-insured financial institution, and to obtain moneys, funds,

credits, assets, securities, and other property owned by and under the custody and control of Salem

Five Cents Savings Bank, by means of false and fraudulent pretenses, representations and promises,

concerning material facts and matters, as follows:

| Count | Date | Mortgage Loan | Mortgage Loan Amount |
|-------|------|---------------|----------------------|
| 17 | 09/28/2007 | Salem Five mortgage loan for the purchase of 10 Navillus Terrace, Unit 2 in the name of G.H. | $247,390.88 |
| 18 | 09/28/2007 | Salem Five mortgage loan for the purchase of 10 Navillus Terrace, Unit 3 in the name of R.H. | $248,633.24 |
| 19 | 09/21/2007 | Salem Five mortgage loan for the purchase of 5 Parkman Street, Unit 2R in the name of M.T. | $215,497.49 |
| 20 | 09/21/2007 | Salem Five mortgage loan for the purchase of 5 Parkman Street, Unit 3L in the name of T.M. | $214,959.20 |
| 21 | 10/12/2007 | Salem Five mortgage loan for the purchase of 7 Parkman Street, Unit 1R in the name of A.S.#2. | $207,246.89 |
| 22 | 10/12/2007 | Salem Five mortgage loan for the purchase of 7 Parkman Street, Unit 2L in the name of M.S.#2. | $192,580.32 |
| 23 | 10/12/2007 | Salem Five mortgage loan for the purchase of 7 Parkman Street, Unit 2R in the name of A.P. | $196,722.29 |

| Count | Date | Mortgage Loan | Mortgage Loan Amount |
|-------|------|---------------|----------------------|
| 24 | 10/12/2007 | Salem Five mortgage loan for the purchase of 7 Parkman Street, Unit 3L in the name of D.S. | $196,722.22 |
| 25 | 10/12/2007 | Salem Five mortgage loan for the purchase of 7 Parkman Street, Unit 3R in the name of J.A. | $185,947.13 |

All in violation of Title 18, United States Code, Sections 1344 and 2.

## COUNTS TWENTY-SIX through TWENTY-SEVEN
### (Unlawful Monetary Transaction – 18 U.S.C. §1957)

91.     The United States Attorney re-alleges and incorporates by reference paragraphs 1

through 86 of this Information, and further charges that:

92.     On or about the following dates, in the District of Massachusetts, and elsewhere,

### MICHAEL R. ANDERSON,

the defendant herein, did knowingly engage and attempt to engage in a monetary transaction, by,

through or to a financial institution, in and affecting interstate commerce, in criminally derived

property of a value greater than $10,000, the particulars of which are described below, and which

was derived from specified unlawful activity, that is, Wire Fraud, in violation of 18 U.S.C. §1343:

| Count | Specified Unlawful Activity | Transaction | Amount |
|-------|----------------------------|-------------|--------|
| 26 | Wire Fraud, to wit, $278,288.28 wire transfer on or about 12/29/2006, for the purchase of 78-80 Granger Street, Unit No. 2, from an account at Citibank, N.A. in New York, New York to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | Wire transfer on or about 01/02/2007 from the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank to the account of Southeast Properties LLC, No. xxxxxxxx5111, at Bank of America. | $161,115.94 |
| 27 | Wire Fraud, to wit, $323,678.11 wire transfer on or about 01/04/2007, for the purchase of 78-80 Granger Street, Unit No. 3, from an account at UBS AG in New York, New York to the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank in Somerville, Massachusetts. | Wire transfer on or about 01/08/2007, from the ANDERSON account, No. xxxxxx0057, at Central Cooperative Bank to the account of Southeast Properties LLC, No. xxxxxxxx5111, at Bank of America. | $105,000.00 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

25

## FORFEITURE ALLEGATIONS
### (18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2)(A) and 28 U.S.C. § 2461(c))

93.     Upon conviction of one or more of the offenses alleged in Counts One through Sixteen of this Information, the defendant,

### MICHAEL R. ANDERSON,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offenses.

94.     If any of the property described in paragraph 93, above, as a result of any act or omission of the defendant –

> a..   cannot be located upon the exercise of due diligence;
>
> b.   has been transferred or sold to, or deposited with, a third party;
>
> c.   has been placed beyond the jurisdiction of this Court;
>
> d.   has been substantially diminished in value; or
>
> e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in  subparagraphs (a) through (e) of this paragraph.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

26

95.     Upon conviction of one or more of the offenses alleged in Counts Seventeen

through Twenty-Five of this Information, the defendant,

**MICHAEL R. ANDERSON,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting,

or derived from, proceeds obtained, directly or indirectly, as a result of such violations.

96.     If any of the property described in paragraph 95, above, as a result of any act or

omission of the defendant –

> a.  cannot be located upon the exercise of due diligence;
>
> b.  has been transferred to, sold to, or deposited with a third party;
>
> c.  has been placed beyond the jurisdiction of this Court;
>
> d.  has been substantially diminished in value; or
>
> e.  has been commingled with other property which cannot be divided without
>     difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. §

2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the

defendant up to the value of the property described in  subparagraphs (a) through (e) of this

paragraph.

All pursuant to Title 18, United States Code, Section 982(a)(2)(A) and Title 28, United

States Code, Section 2461(c).

27

97.    Upon conviction of one or more of the offenses alleged in Counts Twenty-Six

and Twenty-Seven of this Information, the defendant,

**MICHAEL R. ANDERSON,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal,

involved in such offense, and any property traceable to such property.

98.    If any of the property described in paragraph 97, above, as a result of any act or

omission of the defendant –

a. cannot be located upon the exercise of due diligence;

b. has been transferred to, sold to, or deposited with a third party;

c. has been placed beyond the jurisdiction of this Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without
difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. §

2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the

defendant up to the value of the property described in subparagraphs (a) through (e) of this

paragraph.

All pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United

States Code, Section 2461(c).

28

*Respectfully submitted,*

CARMEN M. ORTIZ
United States Attorney

By:

RYAN M. DISANTIS
VICTOR A. WILD
Assistant U.S. Attorneys

DATE:    September 8, 2010